**In re Anthony J. NARDONE and Linda M. Nardone, Debtors.**

**Bankruptcy No. 86-40010-G.**

United States Bankruptcy Court, D. Massachusetts.

March 23, 1987.

See also, Bkrtcy., 69 B.R. 481.

George Desmond, Framingham, Mass., for debtors.

Peter DeGelleke, Bedford, Mass., for E.P. Associates.

## OPINION AND ORDER

JAMES F. QUEENAN, JR., Bankruptcy Judge.

E.P. Associates, Inc. (the "Claimant") has filed a claim against the debtors in this Chapter 13 proceeding, Anthony J. Nardone and Linda M. Nardone (the "Debtors"), in the sum of $41,775.74 plus interest and additional legal expenses. The claim includes $6,166.40 in already incurred legal expenses, and credits the Debtors with $5,500 as the approximate value of the collateral which had secured the debt. The Claimant filed its claim as a secured claim despite this credit because the Claimant obtained real estate attachments upon the Debtors' home in a suit brought in state court prior to the commencement of this Chapter 13 case. The Debtors have filed an objection, which, as amended after trial, sets forth these grounds: (1) no court approval exists for the claimed attorney fees; (2) the collateral should be valued in the amount of the debt rather than at $5,500; (3) the Claimant failed to notify the Debtors of the disposition of the collateral; (4) the Claimant disposed of the collateral in a commercially unreasonable manner (5) the Claimant entered into a novation of the debt by accepting the collateral in satisfaction of the debt; (6) the Claimant retained the collateral in full satisfaction of the debt; (7) unclean hands; and (8) failure of the Claimant to comply with the discovery requirements of Bankruptcy Rule 7026.

The facts as found by the Court after a trial are as follows: on June 9, 1982, the Claimant sold a health spa (known as Woman's World Health Spa) to G.M.J. Associates, Inc., a corporation newly organized by one of the Debtors and another individual. The health spa was located in Waltham, Massachusetts, and operated under a franchise from Raquel, Inc. The selling price was $65,000, of which $15,000 was paid in cash and $50,000 was represented by a promissory note due at the end of seven and one-half years. Anthony J. Nardone, one of the Debtors here, signed the note both individually and on behalf of G.M.J. Associates, Inc. The note was secured by the following: the stock of G.M.J. Associates; essentially all of the assets sold, including equipment, inventory and receivables; and an assignment of the seller's lease and franchise.

The new owner continued the business for a few years thereafter, but Mr. Nardone and the other principal decided to terminate operations in December, 1984 because of continuing losses. The Debtors met at the spa's premises with the Claimant's president, Elizabeth Papia. The Debtors informed Mrs. Papia of the decision to cease operations, and turned over to her the keys to the building and all business property. Although there is some dispute between the parties as to the substance of the conversation which took place, I find that the Debtors did not propose a return of the collateral in satisfaction of the debt, nor did Mrs. Papia, in words or action, indicate the Claimant's assent to any such arrangement.

Mrs. Papia's account of what transpired thereafter is, to say the least, less than forthright. She attempted to deceive the Court into believing that the Claimant was unsuccessful in trying to sell the collateral, and that a third party assumed the lease. What actually occurred was that the business was continued by a new corporation organized by Mrs. Papia, E.M.G. Associates, Inc. ("E.M.G."). The president of E.M.G. is Mrs. Papia, and her daughter is the treasurer. The corporation's board of directors consists of the two of them and Mrs. Papia's sister. Mrs. Papia was, and is, either the sole or principal stockholder of E.M.G. This new corporation thereafter operated essentially the same health spa business as before, at the same location. It operated under the same lease and used all of the equipment which formed a portion of the collateral securing the $50,000 note, plus some additional equipment which the Debtors' corporation had purchased. The only difference in the operations was that E.M.G. operated independently using the name "Workout," instead of as a franchisee of Raquel, Inc. under the name "Woman's World Health Spa." I find that the Claimant retained all of the collateral, in effect transferring the collateral to its sole stockholder, Mrs. Papia, who in turn transferred it to E.M.G. At no time did the Claimant attempt to dispose of the collateral for any consideration.

The Debtors do not request the Court to subordinate this claim as the result of the Claimant's inequitable conduct. Because their Chapter 13 plan proposes a 100% payment to creditors, subordination would be of no benefit to them. Although they set forth a number of grounds for their objection, including the fact that Mrs. Nardone did not sign the Claimant's note, the essential ground is that the Claimant has lost its right to a deficiency by reason of having retained the collateral. The Debtors rely upon various related, yet distinct, principles of law in this regard. Their principal proposition, however, is that the Claimant has failed to fulfill the obligation imposed by the Uniform Commercial Code to dispose of the collateral in a commercially reasonable manner.

Here the Claimant has retained the collateral. Most of the case law dealing with the effect upon the secured party's right to a deficiency of its failure to fulfill its obligations under the Uniform Commercial Code concerns commercially unreasonable sales or sales which have been conducted without proper notice to a debtor. Because of this, and because the governing principles appear to be the same, we turn first to that general topic. We will later focus on the particular problems raised by the collateral's retention.

I  *Effect of Claimant's Breach of Its Obligation on Its Right to a Deficiency*

There is no provision in the Uniform Commercial Code purporting to deal expressly with the effect that failure by a secured party to dispose of collateral has upon his right to a deficiency. If a disposition has been made in a commercially unreasonable manner, the debtor is given the right to recover any resulting loss from the secured party. MASS.GEN.L. ch. 106, § 9–507. If it is established that the secured party is not proceeding in accordance with its statutory obligations, the debtor may obtain a mandatory injunction compelling the secured party to do so. *Id.* By separate statute, the secured party is made liable for a deficiency. MASS.GEN.L. ch.

106, § 9–504. Professor Gilmore, one of the draftsmen of the U.C.C., frankly confesses that he and the other drafters gave no conscious attention to the relationship between the debtor's liability for a deficiency and the secured party's liability for noncompliance with the required default procedures. He points out that the U.C.C. provisions in this regard were modeled after the Uniform Conditional Sales Act, and that the courts interpreted that Act's provisions as prohibiting a defaulting secured party from collecting a deficiency. Professor Gilmore concludes that under the U.C.C. compliance with the default procedure is a condition precedent to the recovery of a deficiency. *See* 2 G. Gilmore, *Security Interests in Personal Property* § 44.9.4 at 1264 (1965).

Not all of the courts have agreed with Professor Gilmore. Perhaps no other area of the Uniform Commercial Code has produced such division in the case law. There are three schools of thought. *See* White & Summers, *Uniform Commercial Code* § 26–15 (2d ed. 1980); 1A P. Coogan, W. Hogan & D. Vaghts, *Secured Transactions Under the Uniform Commercial Code* § 8.06[2]; 9 R. Anderson, *Uniform Commercial Code* §§ 9–504:90 to 9–5–4:93 (3rd ed. 1985); Annotation, 10 A.L.R.4th 413 (1981).

A. *Absolute Preclusion Approach*

A number of courts have indeed concluded that compliance by the secured party with his obligations at foreclosure are conditions precedent to his right to a deficiency. The decisions adopting this approach, sometimes called the "absolute preclusion" approach, involve either one of two subtopics; (1) denial of a deficiency because the secured party has failed to give notice of the sale of the collateral to the debtor; and (2) denial of a deficiency because, although the debtor had notice of the sale, the sale was commercially unreasonable. The courts dealing with a lack of notice to the debtor generally deny the deficiency on the grounds that the debtor lacked an opportunity to attend and observe the sale. They reason that, because of this lack of notice,

the debtor could not redeem the collateral or effectively attack its commercial reasonableness. *See, e.g., Wells Fargo Bank v. Carter (In re Carter)*, 511 F.2d 1203, 1204 (9th Cir.1975) (applying California law); *Camden National Bank v. St. Clair*, 309 A.2d 329, · 13 U.C.C.Rep.Serv. 199 (Me. 1973); *First National Bank of Belvue v. Rose*, 197 Neb. 392, 249 N.W.2d 723, 20 U.C.C.Rep. 1413 (1977). This rationale, however, is lost when the debtor has notice, but the sale is commercially unreasonable. *See Ford Motor Credit Co. v. Jackson*, 126 Ill.App.3d 124, 81 Ill.Dec. 528, 466 N.E.2d 1330, 39 U.C.C.Rep.Serv. 743 (1984).

Courts faced with a commercially unreasonable sale for which the debtor had notice employ a variety of rationales to justify the absolute preclusion approach. Some decisions rely on the similarity between the U.C.C. provisions and those of the Uniform Conditional Sales Act ("U.C.S.A."). *Chittenden Trust Co. v. Maryanski*, 138 Vt. 240, 415 A.2d 206, 28 U.C.C.Rep.Serv. 1237 (1980). They reason that the U.C.C. is still subject to prior law through U.C.C. § 1–103, a provision which permits principles of law and equity outside the U.C.C. to govern if not displaced by provisions in the U.C.C. *E.g., Chittenden Trust, supra; see Atlas Thrift Co. v. Horan*, 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 11 U.C.C.Rep.Serv. 417 (3d Dist.1972); *Aetna Finance Co. v. Ables*, 559 S.W.2d 139 (Tex.Civ.App.1977). These courts believe that the U.C.C. places minimal burdens upon upon the foreclosing secured creditor, concluding that it is not unfair to deny the creditor all rights to a deficiency if he does not carry out his minimal obligations. *Chittenden Trust Co., supra; Atlas Thrift Co., supra.* At least one case points out that the damages available to the debtor in U.C.C. § 9–507(1) is not an exclusive remedy under the terms of that provision, and that U.C.C. § 1–103 provides that remedies are intended to be cumulative. *Aetna Finance Co. v. Ables*, 559 S.W.2d 139 (Tex.Civ.App.1977). Most courts, however, tend to equate default of the creditor's obligations with a loss of deficiency rights, with little or no discus-

sion of their reasons, as did many of the cases under the U.S.C.A. *See, e.g., Skeels v. Universal C.I.T. Credit Corp.,* 222 F.Supp. 696 (W.D.Pa.1963); *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F.Supp. 659 (W.D.Okla.1972); *Jackson State Bank v. Beck,* 577 P.2d 168, 23 U.C. C.Rep.Serv. 1099 (Wyo.1978).

## B. *Rebuttable Presumption Approach*

Perhaps a greater number of courts take a less rigid position, but one which nevertheless places a substantial burden upon the secured party. This school, sometimes called the "rebuttable presumption" approach, holds that when the secured party fails to live up to his foreclosure obligations, a rebuttable presumption is created that the value of the collateral was worth the amount of the debt, and in order to dispel this presumption the secured party has the burden of proving that the collateral was worth less. These courts reject the absolute preclusion approach on the ground that it gives the debtor a windfall and imposes an unnecessary penalty upon the secured party. But they adopt the presumption, and impose the burden of proof upon the secured party, out of the belief that the debtor is often in a difficult position, as a practical matter, to prove his damages. *See, e.g., United States v. Willis,* 593 F.2d 247 (6th Cir.1979) (applying federal rule of decision); *In re Andersen,* 50 B.R. 137, 41 U.C.C.Rep.Serv. 1139 (Bankr.W.D.Mich.1985) (addressing a lack of notice to the debtor of the sale and choosing to follow the *Willis* standard rather than an intermediate Michigan appellate court); *Universal C.I.T. Credit Co. v. Rone,* 248 Ark. 665, 453 S.W.2d 37, 7 U.C. C.Rep.Serv. 847 (1970); *Weiner v. American Petrofina Marketing, Inc.,* 482 So.2d 1362, 42 U.C.C.Rep.Serv. 810 (Fla.1986); *First Galesburg National Bank & Trust Co. v. Joannides,* 103 Ill.2d 294, 82 Ill.Dec. 646, 469 N.E.2d 180, 39 U.C.C.Rep.Serv. 18 (1984); *State Bank of Towner v. Hansen,* 302 N.W.2d 760, 30 U.C.C.Rep.Serv. 1493 (N.D.1981); *Savoy v. Beneficial Consumer Discount Co.,* 503 Pa. 74, 468 A.2d 465, 37 U.C.C.Rep.Serv. 1422 (1983).

## C. *Damage Setoff Approach*

A third approach, sometimes called the "damage setoff" approach, has been adopted by the smallest number of courts. These courts view the secured party's right to a deficiency and the debtor's right to damages as independent rights which must be separately established, with the debtor having the burden of proving his damages and then obtaining a setoff of the damages against the deficiency claim. These courts also point to the windfall that a debtor can realize from the absolute preclusion approach. They read the provisions of U.C.C. § 9–504 and § 9–507 as speaking, respectively, only of a deficiency claim and a damage claim. They contrast these sections with U.C.C. § 2–706, which indicates that a seller who resells after the buyer's breach may recover his damages from the buyer only if he resells in a commercially reasonable manner. Some of these decisions also rely on the policy declaration in U.C.C. § 1–106 against penal damages. *See, e.g., Barbour v. United States,* 562 F.2d 19 (10th Cir.1977) (applying federal rule of decision); *Valley Mining Corp. v. Metro Bank,* 383 So.2d 158, 28 U.C.C.Rep. Serv. 1231 (Ala.1980); *Beneficial Finance Co. v. Young,* 612 P.2d 1357, 29 U.C.C.Rep. Serv. 359 (Okla.1980); *Zions First National Bank v. Hurst,* 570 P.2d 1031, 22 U.C.C. Rep.Serv. 1071 (Utah 1977).

## D. *Massachusetts Law*

We have set forth this division in the case law at some length because the law in Massachusetts is not entirely clear. At one time, there was a difference of opinion within the appellate division of the Massachusetts District Court, the state's lowest appellate court. *Compare Abbot Motors, Inc. v. Ralston,* 28 Mass.App. Dec. 35, 5 U.C.C.Rep.Serv. 788 (1964) (sale of collateral without notice to debtor did not bar liability for a deficiency) *with One Twenty Credit Union v. Darcy,* 40 Mass.App. Dec. 64, 5 U.C.C.Rep.Serv. 792 (1968) (secured party who gave no notice of the sale is not entitled to a deficiency). In *Poti Holding*

*Company, Inc. v. Piggott,* 15 Mass.App.Ct. 275, 444 N.E.2d 1311, 35 U.C.C.Rep.Serv. 337 (1983), the Massachusetts Appeals Court, a higher intermediate appellate court, affirmed a deficiency judgment under rather unique circumstances. Through a judicial admission, the debtor had admitted that the foreclosure sale brought about the fair market value of the collateral. A master had found that the secured party did not sell in a commercially reasonable manner. The master based this finding on his subsidiary finding that the secured party had not sustained its burden of proof in failing to submit evidence on such matters as the auctioneer's experience and the areas of circulation of the newspapers in which advertisements had been placed. The court reviewed the division in the case law, and concluded that the most appropriate analysis was one which balanced the equities between the parties so as to adjust the remedy to the particular circumstances before it. *Poti Holding Co.,* 15 Mass. App.Ct. 275, 444 N.E.2d 1311, 35 U.C.C. Rep.Serv. at 340. It declined to adopt any one of the three possible approaches as the rule of law to be applied in all circumstances. It did, however, regard a fixed rule barring a deficiency claim due to the secured party's failure to live up to his obligations as being inconsistent with both MASS.GEN.L. ch. 106, § 9–507, which provides only for a damage claim by the debtor, and MASS.GEN.L. ch. 106, § 1–106, which contains a general policy declaration against penal damages. The court was obviously influenced by the fact that the sale was defective only by reason of a rather strict application of burden of proof requirements, and that the sale had produced the property's fair market value.

More recently, the Supreme Judicial Court of Massachusetts, the Commonwealth's highest court, decided *Shawmut Worcester County Bank v. Miller,* 398 Mass. 273, 496 N.E.2d 625, 2 U.C.C.Rep. Serv.2d 383 (1986). The trial judge in that case had granted the bank's motion for summary judgment on its deficiency claim based upon affidavits setting forth an allegedly reasonable sales effort and a sales price which was 92% of the value arrived at by the bank's appraiser. Opposing affidavits of the defendant guarantors asserted a number of allegedly unreasonable actions on the part of the bank, including removal of equipment collateral to a warehouse from a modern plant where its operation could have been demonstrated in connection with the sale. The court ruled that summary judgment was improperly granted because of the existence of material issues of fact on the question of commercial reasonableness, and it remanded the case for trial. It added, by way of dicta and without discussion, that if the bank was unsuccessful in demonstrating it had disposed of the collateral in a commercially reasonable manner, the bank would still be entitled to obtain a deficiency judgment in the amount of its debt less any loss resulting from its default, citing *Poti* and U.C.C. § 9–507(1), the provision granting a debtor the right to damages.

We do not interpret this brief statement in *Miller* as an adoption by the Massachusetts Supreme Judicial Court of the damage setoff approach. The Court did approve of the Appeals Court decision in *Poti.* But *Poti,* as we read the decision, does no more than reject the absolute preclusion approach. The *Poti* court expressly refrained from discussing questions of burden of proof or presumption because the collateral's fair market value had been conclusively established. The *Poti* court did, however, approve a balancing of the equities of the particular case.

We therefore conclude that the Massachusetts courts would recognize the difficulties a debtor may have in proving its damages. This is the consideration which is so inherent in the rebuttable presumption approach, where the courts place upon the secured party the burden of proving value in order to rebut the presumption. These courts do this even though, by the general agreement of all courts, the secured party also has the burden of proving in the first instance that it disposed of the collateral in a commercially reasonable manner. *See generally* cases cited in Part

I(B) of this opinion, *supra.* This concern for the debtor (or, more often, for the individual guarantors of a corporate debtor) is usually well placed. Often the secured party, and not the debtor, has had an appraisal made of the collateral, frequently at a public auction value which approaches distress value. The debtor, on the other hand, is likely to be in the position of having to prove value through an old purchase price, his own inexpert opinion as owner, or through an opinion that may necessarily be based upon retail values outside of the context of a foreclosure sale.

Because of the particular circumstances before us here, however, we need not completely divine the intentions of the Massachusetts courts. With the foregoing considerations in mind, we turn to the Debtors' argument that the Claimant has lost its right to a deficiency because it has chosen to retain the collateral.

## II *Retention of Collateral As a Bar to the Deficiency Claim*

The Debtors' principal argument is that the Claimant's deficiency rights have been terminated because it chose to retain the collateral.

### A. *Accord and Satisfaction*

■ The Claimant has certainly not terminated its deficiency claim as a matter of contractual assent in the nature of accord and satisfaction. We have found that at the December, 1984 meeting of the parties, immediately after the Debtors' business was terminated, the Debtors did not ask the Claimant to accept the collateral in satisfaction of the debt. We have also found that Mrs. Papia, on behalf of the Claimant, did not indicate any assent or desire for such an arrangement. The substance of the conversation consisted only of Mr. Nardone informing Mrs. Papia that his business had been terminated and that he was turning everything back to the Claim-

ant. Moreover, the Claimant's suit on the deficiency in the state courts thereafter is inconsistent with any such intent. This is a question of fact, and I find that no such consent or intention was present.

### B. *Retention as a Bar to Deficiency Claim as a Matter of Law*

■ The Debtors contend, however, that their rights in this regard are not dependent upon the intentions and assents of the parties. They argue that where, as here, a secured party retains collateral for an unreasonable period of time without disposing of it, the secured party loses its deficiency claim as a matter of law. In support of this proposition, they cite *Service Chevrolet, Inc. v. Sparks,* 99 Wash.2d 199, 660 P.2d 760, 35 U.C.C.Rep.Serv. 1371 (1983), and *Moran v. Holman,* 514 P.2d 817, 13 U.C.C.Rep.Serv. 206 (Alaska 1973). Both of these decisions do indeed stand for that proposition. Although neither decision purports to adopt the absolute preclusion approach, both courts in effect applied this approach by deeming the secured party to have retained the collateral in satisfaction of its debt.[1] Their holdings, therefore, appear inconsistent with *Poti* and *Miller,* both of which rejected the absolute preclusion approach.

■ Nor can the claimant's deficiency be barred on the ground that it has elected the remedy given it under the Uniform Commercial Code to retain the collateral in satisfaction of the debt. To do so, it is necessary that a secured party give written notice of its proposal to retain (unless after default the debtor has signed a waiver of such notice), and that the debtor fail to object in writing within twenty-one days. MASS.GEN.L. ch. 106, § 9–505(2). Here no such notice was sent. It would be an emasculation of § 9–505(2) to hold that the secured party's actual retention without objection by the debtor is equivalent to the procedure under the statute. The Claim-

---

**1.** The *Service Chevrolet* case is also distinguishable because the court relied on a unique amendment to the U.C.C. in Washington, an additional paragraph to 9–501(1) which barred a secured party from suing for a deficiency if it retained consumer goods in satisfaction of a debt.

ant's inaction here is more properly measured against an entirely different statute: § 9–504, the section imposing a general obligation of commercial reasonableness.

### C. *Retention as a Failure to Dispose of Collateral in a Commercial Reasonable Manner*

■ MASS.GEN.L. ch. 106, § 9–504(3) provides in part as follows:

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, *time*, place and terms must be commercially reasonable (emphasis added).

We do not interpret the statute's reference to the "time" of the sale as applying only to the time that an actual sale is conducted. We read it as also imposing an obligation upon the secured party to dispose of the collateral within a commercially reasonable time. *See Mack Financial Corp. v. Scott,* 100 Idaho 889, 606 P.2d 993, 28 U.C.C.Rep.Serv. 915 (1980); *Harris v. Bower,* 266 Md. 579, 295 A.2d 870, 11 U.C. C.Rep.Serv. 428 (1972). *See also* 9 R. Anderson, Uniform Commercial Code § 9–504:20 (3d ed. 1985).

■ Here, two years have elapsed since the Claimant obtained possession. The Claimant has not made any effort to sell or otherwise dispose of the collateral. Rather, it has allowed the collateral to be used by a corporation controlled by its principal stockholder. Certainly far more than a reasonable time has elapsed. The Claimant is in default in its obligation to dispose of the collateral in a commercially reasonable manner.

In determining the effect that this default has upon the Claimant's right to a deficiency, it is unnecessary for us to choose among the three approaches, or, specifically, between the rebuttable presumption and damage setoff approaches.

Under either, the Claimant loses its deficiency claim.

■ The Debtors' damages from the Claimant's failure to sell within a commercially reasonable time consist of the difference between the collateral's fair market value at foreclosure and the amount of the debt. Under a rule of setoff, if the fair market value equals or exceeds the debt, then obviously this claim should be disallowed. The result is the same under the rebuttable presumption approach if the presumption remains unrebutted. We find that the value of the Claimant's collateral, when sold at foreclosure in a commercially reasonable manner, equals or exceeds the debt owed the Claimant. We base this finding upon two items of evidence: the sale of the collateral in June of 1982 for $65,000, and the testimony of Mr. Nardone that the collateral is worth in excess of $60,000. Both of these figures exceed the amount of the claim, including interest and legal fees which accrue in any event only to the extent of the value of the underlying security interest. *See* 11 U.S.C. § 506(b). The Claimant offered no evidence concerning the collateral's value, and gave no support for the sum of $5,500 which it credited against the debt by reason of the retention.

The foregoing applies primarily to the claim against the Debtor Anthony J. Nardone. It is unnecessary to pass on the Debtors' other grounds for objection, except to dismiss the claim against the Debtor Linda M. Nardone for the additional reason that she is not a signatory to the Claimant's promissory note. Suit was brought against her in the state courts on the theory that her husband had transferred the Debtors' home to her in fraud of his creditors, in order to avoid an attachment on the home. The Claimant was ultimately successful in obtaining that attachment despite the transfer. The attachment, however, is invalid by reason of this Court's disallowance of the claim against both Debtors.

### CONCLUSION

The Claimant's claims against the Debtors Anthony J. Nardone and Linda M. Nar-

done, secured by real estate attachments, are disallowed. The attachments of E.P. Associates, Inc. against the real estate of Anthony J. Nardone and Linda M. Nardone (dated March 12, 1985 and recorded in the Worcester District Registry of Deeds in Book 8605, Pages 201 through 204) are dissolved. A separate order to this effect will be issued for recording in the real estate records.

SO ORDERED.

Douglas A. Strauss, David A. Greenberg, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for debtor.

Christopher Belmonte, Kevin Preston, Lane & Mittendorf, New York City, for Waldco, Inc.

Donald Lee Rome, Stephen E. Goldman, Susan Roman, Robinson & Cole, Hartford, Conn., for Chase Manhattan Bank, N.A.

Thomas A. Gugliotti, Walter E. Paulekas, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for Old Stone Bank.

Michael A. Zizka, Murtha, Cullina, Richter & Pinney, Hartford, Conn., Ethan D. Fogel, Neal Colton, Dechert, Price & Rhoads, Philadelphia, Pa., for Societe Generale.

Martin W. Hoffman, Hartford, Conn., for Unsecured Creditors' Committee.

Byron P. Yost, Evans & Baldwin, Bridgeport, Conn., for Richard E. Roy.

Richard Belford, New Haven, Conn., trustee.

Wayne Davis, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Dewey, Ballatine, Bushby, Palmer & Wood.